

AO 91 (Rev. 11/11)  Criminal Complaint

**FILED**

# UNITED STATES DISTRICT COURT
for the
Northern District of California

JAN 14 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

| | |
|---|---|
| United States of America<br>v.<br><br>DAVID HA<br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.

**CR 21 70046 MAG**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____November 5, 2020_____ in the county of _____Santa Clara_____ in the
_____Northern_____ District of _____California_____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 841(a)(1), (b)(1)(B)(viii) | Distribution of Controlled Substances and Possession with Intent to Distribute |
| | Maximum Penalties: Minimum of 5 years in prison up to 40 years in prison; $5,000,000 fine; at least 4 years supervised release up to lifetime supervised release; and a $100 special assessment |

This criminal complaint is based on these facts:

See attached affidavit of DEA Special Agent Suzette Abbasciano

☑ Continued on the attached sheet.

Approved as to form ___/s/___
AUSA Daniel Pastor

Sworn to by telephone before me pursuant to
Fed. R. Crim. P. 4.1.

Date: _____01/14/2021_____

City and state: _____San Francisco, California_____

/s/ Suzzette Abbasciano via telephone
*Complainant's signature*

Suzzette Abbasciano, DEA Special Agent
*Printed name and title*

*Judge's signature*

Alex G. Tse, U.S. Magistrate Judge
*Printed name and title*

SEALED BY ORDER OF COURT

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR COMPLAINT

I, Suzzette S. Abbasciano, a Special Agent with the Drug Enforcement Administration, being duly sworn, declare and state:

### INTRODUCTION

1.      I make this affidavit in support of a Criminal Complaint charging **David HA** (HA) with distribution and possession with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii).

### SOURCES OF INFORMATION

2.      The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses.  Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part.  Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

3.      Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included each and every fact known to me about this case.  Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint.

### AFFIANT BACKGROUND

5.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18 United States Code, Section 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to initiate arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

1

6.      I am a Special Agent ("SA") employed by the Drug Enforcement Administration ("DEA") and have been so employed since January 2018.  I am currently assigned to the San Francisco Field Division.  I am authorized and am presently assigned to investigate violations of the Controlled Substance Act ("CSA"), Title 21, United States Code, and other violations of federal law.

7.      Before becoming a DEA SA, I was a crisis response analyst with Uber Technologies Inc.  In this capacity, I assessed Uber's responses to crises related to terrorist and organized crime attacks, natural disasters, and other major emergency events.  I also updated and developed protocols and risk assessments to assist in Uber's mission to complement the emergency services of a given location.

8.      Prior to working with Uber, I served as a crisis response analyst with the North Atlantic Treaty Organization ("NATO") where I assisted in developing large-scale military exercises for the Alliance, including at the Defense Minister and Ambassador levels, which took into account threats posed by terrorist and organized criminal networks.  I was also a research analyst and project manager with the National Consortium for the Study of Terrorism and Responses to Terrorism ("START"), a Department of Homeland Security Center of Excellence, focused on analyzing a potential terrorism-organized crime nexus in relation to radiological and nuclear material trafficking.  With START, I conducted risk assessments on over 200 terrorist or organized crime groups, helped develop interactive GIS materials on groups' trafficking routes, and conducted network analysis to identify trafficking hot spots in South America, Central America, and Europe.

9.      I have had the opportunity to work on multiple organized crime, illicit trafficking, and terrorism related grants, and to conduct international fieldwork as a criminology doctoral student.  Through these opportunities, I have been able to speak extensively with experienced law enforcement, military and intelligence officers, and researchers about illicit trafficking networks and their smuggling routes and methods.  I have collected, organized, and

2

analyzed material related to drug trafficking network structures, leadership hierarchies, group composition and skill sets, and their relationships with supporting and rival groups.

10.     During my employment with the DEA, I have received nineteen weeks of full-time formalized education, training, and experience at the DEA Basic Agent Training Academy in Quantico, Virginia.  This education, training, and experience included but was not limited to drug detection, drug interdiction, money laundering techniques, and schemes and investigation of individuals and organizations involved in the smuggling, cultivation, manufacture, and illicit trafficking of controlled substances.

11.     As an SA, I have participated in multiple narcotics investigations either as a case agent or in a supporting role.  I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics-trafficking organizations.  I also have participated in many aspects of drug investigations including, but not limited to, telephone toll analysis, and records research, as well as physical and electronic surveillance.  I have participated in the execution of several federal and state narcotics search and arrest warrants that resulted in the arrest of suspects and the seizure of narcotics.  In addition, I have attended seminars and courses on money laundering and internet investigations related to drug trafficking.

12.     Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of numerical codes and code words to conduct business.  I have also become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

\\

## APPLICABLE LAW

13.     Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person to knowingly distribute, or possess with intent to distribute, a controlled substance. Under 21 C.F.R. § 1308.12(d)(2), methamphetamine is a Schedule II controlled substance.

## STATEMENT OF PROBABLE CAUSE

14.     In September 2019, DEA agents met with a DEA confidential source (hereinafter "the CS")[1], who was in contact with David HA, and who told agents that he/she had supplied HA with marijuana in the past. The CS also told agents that HA is known to sell pills containing controlled substances, including ecstasy, marijuana, and cocaine.  According to the CS, HA obtains the pills through an individual who has access to prescription pads. The CS told agents that HA was calling the CS using telephone number 408-784-0355.

15.     On March 4, 2020, the CS received a Snapchat message from HA, which revealed a username of "chino40888," and a display name of "David."  HA provided the CS with a residential address of 77 W. Humboldt Street, San Jose, CA.

16.     On March 5, 2020, agents directed the CS to meet with HA outside of HA's residence. During the meeting, agents listened over an audio transmission as the CS told HA that a friend of his/hers was interested in purchasing either Xanax or oxycodone pills.

17.     HA told the CS he could not get either of the requested pills. Oxycodone pills in particular were too difficult to obtain; however, HA said he could get ecstasy.

18.     HA told the CS he had three ecstasy sources of supply, including one in New York and another in Europe.  HA mentioned he could also get ecstasy from someone locally, which would take a day to be delivered.  HA noted the ecstasy from Europe was of higher grade

---

[1] The CS has been cooperating with the DEA since 2017.  The CS is working for judicial consideration arising from his/her arrest in 2016 on charges related to the possession of controlled substances.  To date, the CS's handlers have not known the CS to provide any information determined to be false or misleading.  The CS's handlers are often able to corroborate the CS's information through surveillance and other sources.  Based on that corroboration, the CS's handlers believe the CS is reliable.

than the ecstasy in the U.S. and would take approximately two weeks to be delivered. HA added that a "boat" (a reference to 1,000 pills) of ecstasy would cost approximately $8,000.

19.     During the meeting, HA asked the CS if he/she knew of anyone renting warehouses. HA stated he would pay $3,000 on top of the monthly rent, and would pay the CS approximately $2,000 per month for finding the warehouse. HA said that he was looking to expand the number of indoor marijuana grows he was operating. HA then showed the CS photos from his phone of the warehouses he operates.

20.     HA told the CS he was also growing marijuana in the garage of the house in front of which he and the CS were standing.  HA said he would continue to operate the garage grow until he was evicted from the house. HA told the CS he makes money by selling marijuana to individuals who then sell it out of state.

21.     On August 10, 2020, U.S. Magistrate Judge Susan Van Keuelen provided authorization to set up a pole camera across from HA's residence at 77 Humboldt Street, San Jose, CA. On August 14, 2020, agents installed the pole camera.

22.     On August 20, 2020, agents conducted surveillance in and around HA's residence.  Agents observed HA meet and conduct hand-to-hand exchanges with multiple individuals who drove to the front of HA's residence or into his driveway.

23.     On September 24, 2020, DEA agents met with the CS to discuss the CS's recent conversations with HA. The CS told agents that HA, via Snapchat, said his ecstasy source of supply could not provide ecstasy at the time. However, HA said that he had a methamphetamine source of supply and quoted the CS a price of $10,000 per kilogram for methamphetamine.

24.     On October 13, 2020, agents directed the CS to meet HA at a public location to discuss the purchase of methamphetamine. While establishing surveillance at the public location, agents observed HA arrive in a black BMW 740i, bearing CA license plate 6KIW024.

25.     During the meeting, agents listened over an audio transmission as HA told the CS he was willing to sell the CS a kilogram of methamphetamine for $10,000. When the CS asked

why the price of the methamphetamine was so high, HA said that he was instructed to do so. When the CS suggested purchasing a "½ boat" of ecstasy, HA said he did not want to split up the "boat" as he was afraid of not being able to sell the other half.

26.     During this meeting, HA also told the CS to start communicating with him through the messaging application Signal, instead of Snapchat, because HA did not trust Snapchat anymore. Based on my training and experience, HA told the CS to use Signal because of the application's strong encryption features.

27.     HA also offered to provide the CS with a separate, encrypted, cell phone to use for future narcotics exchanges, noting he (HA) and his associates use similar phones.

28.     Between October 28, 2020 and October 29, 2020, at the direction of federal agents, the CS sent HA a text through the Signal app to coordinate a purchase of ecstasy and/or methamphetamine. In addition, the CS sought to introduce an undercover agent (UC) to HA and to HA's suspected source of supply, who was visiting the San Francisco Bay Area the same weekend.

29.     The Signal messages between the CS and HA are transcribed below:

> **HA:**   Call you tonight
> Or want to plan a la trip
>
> **CS:**   If he can come so we don't travel just to talk next weekend
>
> **HA:**   Yeah I will tell you ASAP
>
> **CS:**   Ok or do you think we are actually going to be able to get something
>
> **HA:**   Yeah he has it
>
> **CS:**   Ok this one is for the ice or the boat
>
> **HA:**   Ice
>
> We can find the boat over there too
>
> **CS:**   Ok let me know asap

(The next day, October 29, 2020)

**CS:**   Anything

**HA:**   Nope

**CS:**   Ok if you can find out because my guy is ready to buy if you can get me a answer so that my guy won't go somewhere else thinking we are full of bullshit

30.     Based on my training, experience, and knowledge of previous conversations between the CS and HA, "ice" refers to methamphetamine and the "boat" refers to ecstasy.

31.     On October 30, 2020, the CS contacted HA to ask HA to procure a kilogram of methamphetamine for the CS's "guy," a reference to the UC. HA stated he needed to travel to Los Angeles to obtain the methamphetamine and invited the CS to travel with him. The CS declined to make the trip.

32.     HA traveled to the Los Angeles area on November 2, 2020, with a vehicle containing a hidden compartment.  HA contacted the CS again on November 3, 2020, stating that he had returned from Los Angeles with the methamphetamine.

33.     On November 3, 2020, a DEA agent assisted in repairing the court authorized pole camera at HA's residence, 77 Humboldt Street, San Jose, CA. While there, the agent observed HA's BMW parked in front of HA's residence.

34.     On November 5, 2020, a DEA UC conducted a controlled purchase from HA of one kilogram of methamphetamine for $10,000 at the Café Paradise parking lot, 2400 Monterey Road, San Jose, CA. When the UC arrived at Café Paradise with the CS, HA was sitting in the driver's side seat of his BMW. HA then exited the BMW and pulled out a black plastic bag from the trunk. HA then entered the back of the CS's vehicle and handed the package to the UC. Inside the bag, the UC observed a white crystalline substance, suspected to be methamphetamine, in a transparent bag.

35.     Agents later field tested the substance, and it tested positive for the presence of methamphetamine. Agents also weighed the substance, and it weighed approximately 1,038

grams.

36.     On January 11, 2021, the UC contacted HA to follow-up on HA's offer to introduce the UC to his source of supply and sell the UC another one kilogram of methamphetamine. HA responded noting, "I'm hella busy."

37.     On January 12, 2021, HA called the UC to alert the UC he would try to pick up one kilogram of methamphetamine to sell to the UC.

38.     That night, HA contacted the UC and offered to introduce the UC to his source of supply the next day.

**HA:**    Big bro out here too

           If you want to meet him.

**UC:**    Yeah if he's down

**HA:**    Let me set up a meeting

           Are you free tomorrow from 1-5?

**UC:**    Let me check real quick. Yeah. Where would be a good place to meet?

39.     On January 13, 2021, prior to the meeting, HA called the UC and noted he found a tracker on his BMW when he took the BMW into a mechanic's shop. HA cancelled the meeting, a decision with which the UC agreed. HA also stated he planned to cancel all his other upcoming meetings.

## CONCLUSION

40.     Based on the information summarized above, there is probable cause to believe that that **David HA** has violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii) (distribution, and possession with intent to distribute methamphetamine).  Accordingly, I respectfully request that the Court issue a criminal complaint and a warrant for his arrest.

/s/ Suzette Abbasciano via telephone

_____
Suzzette S. Abbasciano
DEA, Special Agent

8

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 14th day of January 2021.  This complaint and warrants are to be filed under seal.

HONORABLE ALEX G. TSE
United States Magistrate Judge